**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **CANAL INSURANCE COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO 04-0094-KD-C** |
| | ) | |
| **UNITED STATES FIRE INSURANCE** | ) | |
| **COMPANY, et al,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

This declaratory judgment action results from a coverage dispute in an underlying case (Civil Action 03-0819-CG-B) and was filed by Canal Insurance Company (Canal) against United States Fire Insurance Company (U.S. Fire), St. Paul Fire and Marine Insurance Company (St. Paul), Golden Peanut Company, LLC. (GP), Christopher Thomas, Inc. (CTI), Jason Tillery, and James Arnold.[1]  Defendants U.S. Fire and St. Paul filed declaratory judgment counterclaims against Canal.

The facts of the underlying case show that on November 4, 2003, Tillery was driving a tractor truck owned by CTI and pulling a trailer owned by GP. (Docs. 42, 44, 45).  CTI and GP had an agreement under which CTI would haul peanuts for GP. (Doc. 55, Exhibit B; Doc. 62).  A brake drum came off of GP's trailer, broke through the windshield of Virginia Arnold's vehicle, and struck her.  Virginia Arnold and her husband, James, filed suit against GP, CTI, and Tillery. Virginia Arnold died on November 11, 2003 and in December 2003, James Arnold was given leave to sue in his capacity as the personal representative of her estate. (Id.)

---

[1] GP, CTI, Tillery and Arnold have been dismissed.

The case was settled on August 16, 2005 for $6.5 million. (Doc. 292). Pursuant to a policy purchased by GP, U.S. Fire paid $1 million; pursuant to a policy purchased by CTI, Canal paid $1 million; and pursuant to an excess policy purchase by GP, St. Paul paid $4.5 million. (Doc. 292). Canal paid for the defense of CTI and Tillery as CTI's employee and U.S. Fire paid for the defense of GP. (Doc. 292).

This matter is now before the court on the following motions:

Canal's motion for summary judgment and brief filed October 28, 2004 (Docs. 55, 56), St. Paul's response filed November 29, 2004 (Doc. 61), U. S. Fire's response and brief filed November 29, 2004 (Doc. 62, 63), Canal's reply to U.S. Fire's response filed February 4, 2005 (Doc. 104), Canal's reply to St. Paul's response filed February 4, 2005 (Doc. 105), U.S. Fire's submission in opposition to Canal's motion for summary judgment filed April 3, 2006 (Doc. 246);

U. S. Fire's motion for summary judgment and brief filed November 19, 2004 (Doc. 62, 63), Canal's response filed February 4, 2005 (Doc. 104), U.S. Fire's reply filed on February 18, 2005 (Doc. 122), U.S. Fire's submission in support of its motion for summary judgment filed April 3, 2006 (Doc. 246), Canal's first response to U.S. Fire's submission filed April 3, 2006 (Doc. 250), Canal's second response in opposition to U.S. Fire's submission filed April 23, 2006 (Doc. 263), and U.S. Fire's reply filed May 8, 2006 (Doc. 284);

St. Paul's motion for partial summary judgment filed January 4, 2005 (Doc. 88), St. Paul's reply filed February 3, 2005 (Doc. 101) and St. Paul's response to Canal's second motion for summary judgment filed April 21, 2006 wherein St. Paul references this motion for partial summary judgment (Doc. 262 );

U.S. Fire's second motion for summary judgment filed January 10, 2006 (Docs. 217, 218); Canal's response (Doc. 228) and U.S. Fire's reply (Doc. 231);

St. Paul's second motion for summary judgment filed April 3, 2006 (Doc. 245), Canal's first response (Doc. 250), Canal's second response (Doc. 263) and St. Paul's reply (Doc. 282); and

Canal's second motion for summary judgment filed April 3, 2006 (Docs. 248,[2] 249), St. Paul's response filed April 21, 2006 (Doc. 262), U.S. Fire's response filed April 24, 2006 (Doc. 266), Canal's reply to St. Paul filed May 2, 2006 (Doc. 275), Canal's reply to U.S. Fire Filed May 3, 2006 (Doc. 278) and Canal's second reply to St. Paul filed May 3, 2006 (Doc. 281).

Other motions are also pending:  St. Paul's motion to strike Canal's first reply (Doc 275) in support of its second motion for summary judgment filed May 3, 2006 (Doc. 277) and Canal's response (Doc. 280); Canal's motion to strike affidavit of Tony Higgins filed May 3, 2006 (Doc. 279) and U.S. Fire's response (Doc. 295); and U.S. Fire's motion to strike Canal's "Federal Government Carrier Profile or Snapshot of Golden Peanut" (Exhibit D to Doc. 263) filed May 8, 2006 (Doc 285) and Canal's response (Doc. 294).[3]

---

[2]  To the extent that this motion moves the court to find that Canal has not waived its right to assert issues of non-coverage as to Tillery and is not estopped from asserting this argument, the motion is **MOOT**. (Docs. 248, 249).  U.S. Fire and St. Paul responded that they have not argued that Canal has made such a waiver or is estopped as to its position regarding non-coverage for Tillery. (Doc. 262, p. 2 "[W]hile there is no issue before this Court in regard to whether Canal may assert its position of non-coverage as to Jason Tillery, this Court must still determine whether the E-45 Truckman's Endorsement in the Canal policy applies to preclude coverage to Jason Tillery"; Doc. 266, p. 5).  However, as Canal points out (Doc. 281), St. Paul does argue that "Canal has waived its position that it is excess to the St. Paul policy." (Doc. 262, p. 2-3).

[3] All the motions in this paragraph are **DENIED**.

I.  Factual background

Canal had issued a Basic Automobile Liability Policy, bearing number 393671, to CTI, a Georgia corporation. (Doc. 55, Exhibit D; Doc. 42; first amended complaint). This policy was in effect from April 22, 2003 to April 22, 2004. (Id.)

U.S. Fire had issued a Commercial Automobile (Business or Truckers) Policy, bearing number 1380338919, to GP, a Georgia company. (Doc. 42; Doc. 245, Exhibit H).  This policy was in effect from July 1, 2003 to July 1, 2004. (Id.)   U.S. Fire had also issued an Excess Insurance policy, bearing number 552-010935-6, to GP. (Doc. 62, Exhibit G).  This policy referenced the St. Paul Umbrella Excess Policy as the controlling underlying insurance "which is excess primary insurance as scheduled therein and/or a self-insured retention." (Doc. 62, Exhibit G, p. 2).  This policy was in effect from July 1, 2003 to July 1, 2004. (Doc. 62, Exhibit G).[4]

St. Paul had issued an Umbrella Excess Policy, bearing number QK06800484, to GP. (Doc. 245, Exhibit I).  The policy referenced the primary Commercial Automobile policy issued by U.S. Fire and was in effect from July 1, 2003 to July 1, 2004. (Id.)

II.  Applicable law in regard to insurance policy interpretation

The insurance policies were delivered in Georgia to CTI, a Georgia Corporation, and Golden Peanut, a Georgia Company.  In this diversity case, the court should apply the law of the state which governs the contract.  See Clanton v. Inter.net Global, L.L.C., 435 F. 3d 1319, 1323 (11th Cir. 2006).  Thus, Georgia law shall apply.  Additionally, the parties agree that Georgia law applies as to the policy interpretation issues. (Doc. 56, 61, 62, 88).

---

[4] This policy is not at issue in the present declaratory judgment action because the settlement in the underlying litigation did not exceed the coverage available under the U.S. Fire automobile policy and the St. Paul excess policy.

4

III.  Summary judgment standard

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).[5]  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden then shifts to the nonmovant to show the existence of a genuine issue of material fact. Id.  "If the nonmoving party fails to makes 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof, 'the moving party is entitled to summary judgment." Id. (quoting Celotex Corp., v. Catrett, 477 U.S. 317 (1986))(footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determination of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 999 (11th Cir. 1992) cert denied, 507 U.S. 911, 113 S.Ct. 1259, 122 L.Ed. 2d 657 (1993) (internal citations and quotations omitted).  However, the mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes

---

[5]  Rule 56(c) of the Federal Rules of Civil Procedure, provides that summary judgment shall  be granted:

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c).

that are material preclude entry of summary judgment. <u>Lofton v. Secretary of Dept. of Children and Family Services</u>, 358 F.3d 804, 809 (11th Cir. 2004), <u>cert</u> <u>denied</u>, 534 U.S. 1081, 125 S.Ct. 869, 160 L.Ed.2d 825 (2005).

The parties all agreed at oral argument that there are no factual disputes which prevent the court from deciding the legal issues in this case on the parties' motions for summary judgment.

IV.  <u>Analysis</u>

A)  <u>Truckman's Endorsement and agreement between CTI and GP</u>

Canal argues that it is entitled to summary judgment on its claims that GP and Tillery are not covered under the Canal policy and that the Canal policy only provides excess coverage for CTI.  The Canal policy contained a form E-45(ai) Truckman's Endorsement which sets forth as follows:

> In consideration of the premium charged for the policy to which this endorsement is attached, it is understood and agreed that no coverage is extended to any person, firm or organization using the described automobile pursuant to any lease, contract of hire, bailment, rental agreement, or any similar contract or agreement either written or oral, expressed or implied, the terms and provision of the Insuring Agreement III of Section A, entitled "Persons Insured" not withstanding.

> In the event the automobile described in this policy is being used or maintained pursuant to any lease, contract of hire, bailment, rental agreement or any similar contract or agreement, either written or oral, expressed or implied, the insurance afforded the named insured shall be excess insurance over any other insurance.

(Doc. 55, Exhibit D; Docs. 104, 105, 278).

Canal points to the first paragraph of the Truckman's Endorsement which it says precludes coverage for GP and Tillery and the second paragraph which it says renders Canal as excess coverage for its insured CTI.  Specifically Canal argues that the endorsement is effective

because the CTI tractor truck was being used in the commercial interest of GP pursuant to a "lease, contract of hire, bailment, rental agreement, or any similar contract or agreement" (Id.) Canal states that the purpose of the endorsement is to shift the risk, and consequently insurance coverage, to GP as the entity for whose business the tractor was put to use and prevent CTI's insurer, Canal, from being on a risk it has not bargained for nor accepted premiums. As support for the argument that the agreement was a lease, contract for hire or similar agreement, Canal relies on the language used in the agreement between GP and CTI which states that CTI is "a firm dedicated to hauling and moving farmer stock peanuts for hire". Canal also relies on the fact that the truck was used to further the commercial interest of GP. (Docs. 55, 56, 104, 105, 263, 278).

U.S. Fire argues that the agreement between GP and CTI does not meet the requirement of a "lease or contract of hire", etc, but instead is a "contract for the provision of transportation services (i.e., the hauling of peanuts)", thus the Truckman's Endorsement does not preclude coverage for GP or Tillery under Canal's policy and does not make U.S. Fire's and St. Paul's policies primary coverage as to CTI. (Docs. 62, 63, 246, 284). St. Paul makes a similar argument. (Docs. 61, 262, 282).

CTI and GP entered into an agreement by which CTI would haul peanuts for GP in trailers owned by GP during the 2002-2004 crop years and until June 30, 2005. (Doc 104, Exhibit B). The parties do not dispute the existence of the agreement, or that the agreement was in effect at the time of the underlying accident, or that the agreement was drafted by GP. The agreement provides as follow:

> Golden Peanut Company LLC, a farmer stock peanut buyer and sheller in
> Headland, AL. Christopher Thomas, Inc. a firm dedicated to hauling and moving

farmer stock peanuts for hire.

Golden offers to Thomas the following consideration for the 2002-2004 crop years:

A. Thomas be the primary hauler for farmer stock being moved into the Headland shelling plant.  Thomas understands that the loads must be moved from the buying points in a timely manner and that some buying points have trucks of their own and will use these trucks to move some or all of the farmer stock that they buy into the Headland shelling plant and Headland and Donalsonville storage warehouses.

B. Golden will pay farmer stock freight rates in effect at the time services for trucking peanuts are provided.

C. Thomas committs (sic) to provide 3 hopper bottom trailers and trucks to the Virginia-Carolina area during harvest season.

D. The no load rate will be figured on a 20 ton minimum unless the equipment provided will not haul 20 tons of farmer stock peanuts.  Then the rate will be figured on the actual hauling capacity of the hopper bottom.

E. Golden will furnish Thomas office space only at the Golden buying point in Headland, AL.

F. Thomas will be responsible for all operating costs associated with the use of the office excluding water and light.

G. Thomas will furnish to Golden proof of insurance as require by Golden on any and all equipment used to provide the services expressed herein.

H. Should Thomas at any time become unable to provide equipment to meet any and all of Golden's trucking needs for the Headland and Donalsonville collection systems then Golden shall have the right to seek trucking services from other sources as necessary.

Golden Peanut Company, LLC will honor this offer through June 30, 2005.

(Doc. 263, Exh. 1)

Initially, the court must determine whether, under Georgia law and the relevant federal regulations, the agreement between CTI and GP is a lease, contract of hire, or other agreement

8

such that it would bring about application of the Truckman's Endorsement.

The affidavit of Dennis Robbins, the Area Procurement Manager for GP sets forth, in part, as follows:

1. The Golden Peanut facility in Headland, Alabama, is a peanut processing plant. In order to transport peanuts to the Headland facility, Golden Peanut utilizes the services of independent third-party trucking companies such as Christopher Thomas, Inc.

4. Pursuant to the agreement, Golden Peanut did not own or hold title to any of the tractors utilized by Christopher Thomas, Inc., to haul goods.

5. Golden Peanut paid no license, use, rental or other fee for the use of any equipment owned or operated by Christopher Thomas, Inc., in the hauling of goods.

6. Golden Peanut paid no taxes, operating allowance, operating expenses or other charges on any equipment owned by Christopher Thomas, Inc., in the transportation of goods.

7. There was no sign or other designation on any equipment utilized by Christopher Thomas, Inc., which attributed ownership or use to Golden Peanut.

8.  There was no other contract, either written or oral, relating in any way to the equipment operated by Christopher Thomas, Inc., other than the contract for services [between CTI and GP].

9. Golden Peanut neither hired Jason Tillery nor paid him any salary or other remuneration. Jason Tillery was an employee of Christopher Thomas, Inc.

10. Golden Peanut exercised no control over Christopher Thomas, Inc.'s selection and use of his employees, drivers and equipment, and Christopher Thomas, Inc., was not required to use any particular tractor or driver to perform the work. Christopher Thomas, Inc., was free to substitute at any time any tractor or driver he wished for the equipment involved in the accident. Further, Christopher Thomas, Inc., owned various trailers which were used to provide transportation services to Golden Peanut.

11. With respect to the loads being hauled by Christopher Thomas, Inc., in November of 2003, Golden Peanut did not dictate or control the route that Christopher Thomas, Inc., and his drivers had to take to get their loads to their final destinations.

12. The hauling of peanuts is seasonal. When the services of Christopher Thomas, Inc., were not being utilized as per the agreement for the hauling of peanuts during peanut season, Christopher Thomas, Inc., was free to use his equipment and employees for other purposes.

(Doc. 62, Exhibit D)[6]

In addition to the affidavit, the deposition testimony of Robbins in the underlying litigation and in the present case, the deposition testimony of Christopher Thomas, President of Christopher Thomas, Inc., and the deposition testimony of Jason Tillery, establishes the following facts concerning the relationship between GP and CTI:

Under the agreement, CTI was the primary hauler for GP at the Headland peanut plant (Doc. 104, Exhibit A, pg. 55; Doc. 245, Exhibit D Robbins deposition, pg. 51-52; Doc. 246) but GP could contract with other trucking companies and CTI could contract outside of the agreement. (Doc. 104, pg. 151-152; Doc. 245, Exhibit D, pg. 94, 151-152).  CTI never relinquished possession of its tractors to GP.   CTI could use any available tractor and driver to haul GP's peanuts.  Moreover, GP did not instruct CTI's drivers regarding which tractor to use to pick up the trailers. (Doc. 245, Exhibit D, pg. 157, 160-161, 170-171, 175-176; Doc. 104, pg. 57).  GP did not own tractors to pull its trailers and did not hire drivers. (Doc. 245, Exhibit C, Robbins deposition in the underlying lawsuit, pg. 64-65, 68, 81).  GP did not interview, hire or fire CTI's drivers and GP did not require a list of the CTI drivers. (Doc. 245, Exhibit D, pg. 156-157).

GP's field agents notified CTI when peanuts were ready for pick up and the location but

---

[6] Paragraph three of this affidavit has been struck by prior order (Doc. 143) and is not included.  With that exception, Canal does not appear to contest any facts alleged in the affidavit, rather they contest the inferences to be made from these facts.

10

did not control the route. (Doc. 245, Exhibit D, pg. 160; Doc. 104, Exhibit A, pg. 67, 109, 110). The field agent instructed CTI where a trailer needed to go for loading and the load would be taken to the Headland plant. (Doc. 104, Exhibit A, pg. 67-68).

CTI was paid by GP based on a "no load, a minimum of 20 tons in some instances" when GP's trailer was empty and "by the weight of the - - - by the miles which calculates into weight of the load" when the trailer was loaded. (Doc. 245, Exhibit D, pg. 175-176, 179). GP paid CTI when it hauled empty trailers or when it delivered the pre-loaded trailers. (Doc. 104, Exhibit A, pg. 83-84, 179-181)

CTI owned ten trucks and twenty trailers which were kept at its facility in Donaldsonville, Georgia and the GP Headland plant. (Doc. 245, Exhibit E, Thomas deposition, pg.10-11). GP furnished CTI with office space at the Headland plant in order for CTI to be available to GP. (Doc. 105, Exhibit A, Robbins deposition, pg. 58). The trailers that CTI hauled were kept at the Headland plant. (Doc. 105, Exhibit A, Robbins deposition, pg. 67) CTI controlled Tillery as its agent or employee and Tillery was hired, trained, and fired by CTI. (Doc. 245, Exhibit E, pg. 22, 43; Exhibit F, Tillery deposition, pg. 35-36, 95). Tillery received his dispatch instructions from CTI. (Doc. 245, Exhibit F, pg. 95-96). CTI made all dispatches for loads and CTI gave Tillery his instructions. (Doc. 245, Exhibit F, pg. 95-96, Exhibit E, pg. 43). CTI did not process, grow, fertilize, pick, harvest, dry, shell, grade, warehouse, load, or sell the peanuts. (Doc. 104, Exhibit A, pg. 42-44, 103-105). These activities were performed by GP through its equipment and employees. (Doc. 104, Exhibit A, pg. 37-40).

Georgia law requires that "all ambiguous instruments must be construed against the party who writes them" Perling v. Citizen & Southern National Bank, 300 S.E.2d 649 (Ga. 1983), and

that "[e]very insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy and as amplified, extended or modified by an rider, endorsement, or application made a part of the policy" Id. at 676.  Ga. Code. Ann. § 33-24-16. With these general principles in mind the court turns to the issue of whether the agreement between CTI and GP falls within the Truckman's Endorsement.

Canal argues that the words in the agreement "for hire" and the fact that the CTI tractor truck was being used to further the commercial interest of GP require a determination that the Truckman's Endorsement is applicable.   However, the undisputed facts of the case and applicable case law dictate a contrary result.

The facts in Canal Insurance Co. v.  Liberty Mutual Insurance Co., 395 F. Supp 962 (N.D. Ga. 1975) are similar to the case at hand.  In Canal, L.C. Townsend had an agreement with Union Camp to harvest, cut and deliver pulpwood from Union Camp land to Union Camp. West, a Townsend employee, had a collision while driving a Townsend truck in performance of the agreement.  Canal Insurance, the insurer for Townsend, argued that West was not covered under the policy because he was driving the truck pursuant to a "contract for hire" which coverage is exempt under the E-45 endorsement.  The E-45 endorsement exempted coverage for a Townsend truck that was leased, bailed or contracted for use by another.  The court, interpreting Georgia law, concluded that the truck involved in the accident was not a "hired vehicle" but instead was used pursuant to "a service contract with L.C. Townsend to provide his own truck." Id. at 974.  The court stated that "there must be a specific rental contract designating the vehicle involved" in order for it to be considered a lease, contract of hire, bailment or rental agreement of a truck. Id. at 972.  The court also relied on the following facts in determining that

the contract was one for service and not a contract to hire the vehicle: that Union Camp never possessed or had any right to possess Townsend's truck, Townsend could have sold the truck or made other use of it without Union Camp's permission, Townsend never gave up custody, possession or control of the vehicle, Townsend had control over his employees who drove the truck and the equipment that was used, Union Camp paid no license tax, use tax or other taxes on the truck, and there was no sign or identification on the truck that indicated it was owned or used by Union Camp. Id.

In the present case, the agreement between GP and CTI is not materially distinguishable from the agreement in Canal. Specifically, CTI maintained control over the employees who drove the truck, CTI trained the employees and gave them instructions. Also, CTI maintained complete control and custody over the equipment that would be used to perform the contract and could sell or buy any equipment that it desired. It was CTI's responsibility to maintain its equipment and have the necessary equipment available to perform the contract. It was totally up to CTI to decide which specific truck would be used to perform the work that was contracted with GP. There was no contract designating the specific vehicle or equipment involved.

As stated in Canal, "'lease' has been defined by the Georgia Court of Appeals as the following: 'when used with reference to tangible personal property the word 'lease' means a contract by which one owning such property grants to another the right to possess, use and enjoy it for a specified period of time in exchange for the periodic payment of a stipulated price referred to as rent.' Undercofler v. Whiteway Neon Ad, Inc., [152 S.E.2d 616] (Ga. App. 1966)." Id. at 972. Thus, it is clear under Georgia law that the agreement at issue in this case would not be considered a lease or similar agreement but rather a service contract. Accordingly, the

Truckman's Endorsement does not apply.

Canal attempts to distinguish the <u>Canal</u> case by pointing out that CTI, unlike Townsend, did not harvest the product but merely drove the peanuts from pick-up to delivery. Specifically Canal says that unlike the Townsend agreement, trucking was not merely incidental in the GP agreement. This distinction is unavailing as the fact remains that the contract was one for a service, i.e. transportation. How the peanuts were transported and with what equipment was left to the discretion of CTI. GP did not lease, rent or contract for hire any particular vehicle, thus the Truckman's Endorsement does not apply.

Canal's argument that the language in the agreement "for hire" converts the service agreement to a contract for hire is also not convincing. The court notes that despite the caption identifying CTI as "a firm dedicated to hauling and moving farmer stock peanuts for hire", paragraph B states that "Golden will pay farmer stock freight rates in effect at the time <u>services for trucking peanuts</u> are provided". (Doc. 263, Exhibit 1). Also, paragraph H states that "[s]hould Thomas at any time become unable to provide equipment to meet any and all of Golden's trucking needs for the Headland and Donalsonville collection systems then Golden shall have the right to seek <u>trucking services</u> from other sources as necessary." (Doc. 263, Exhibit 1). This language would indicate a service agreement was contemplated. Including the phrase "for hire" in the title of the agreement does not convert its terms and conditions.

<u>Southern General Insurance Co. v. Alford,</u> 507 S.E.2d 179 (Ga. App. 1998) also supports the undersigned's decision. In this case Harris, the owner and driver of the truck, was pulling a trailer owned by McLucas and loaded with timber cut by McLucas. An accident occurred when Harris left the truck unattended and it rolled into a building. McLucas' insurer

denied coverage arguing that the truck was not a "hired automobile" as required for insurance under the policy.  Although there was no written contract, the court found that a verbal agreement existed under which Harris would haul timber for McLucas. Id. at 181.  The court determined that the truck involved was not a "hired automobile" based on the fact that Harris was an independent contractor, ran his own company, owned his own tractor, paid for oil gas and maintenance of the tractor, and set his own schedule.  Id. at 181-182.  The same facts are present in the case at issue.  CTI was an independent contractor.  CTI owned the tractor and was responsible for its maintenance.  Moreover, although a written agreement existed between CTI and GP, it does not designate any specific tractor as leased, rented, or hired, but instead CTI was free to use any tractor it selected for the haul.

Additionally, acknowledging that the case is not precedent for the Eleventh Circuit, the court is also persuaded by the reasoning in Liberty Mutual Fire Insurance Co. v. Canal Insurance Co., 177 F. 3d 326 (5th Cir. 1999) wherein under an analysis of Mississippi law, the Fifth Circuit upheld a finding that a hauling agreement was not a contract of hire within the meaning of Canal's Truckman's Endorsement.  As the basis for the decision the court found that the agreement did not require the tractor owner to use any specific vehicle, did not allow the purchaser of hauling services to "operate, direct, or control" the tractors or drivers, and that under the agreement the purchaser of hauling services chose the delivery destination but had no authority to select the route taken or the drivers.  Id. at 334.  As outlined above, these same facts are found in the present case.

Canal also relied upon McMillon v. Empire Fire & Marine Ins. Co., 433 S.E.2d 429 (Ga. Ct. App. 1993)  In McMillon, a tractor trailer driven and owned by Gail Washington struck

another automobile while Washington was hauling goods for Smalley Transportation pursuant to a "trip lease agreement".  Id. at 430.  Washington's insurance on the truck had a clause which excluded coverage for "property damage while a covered auto is used to carry the property of another or while a covered auto is used in the business of anyone to whom the auto is leased or rented." Id. at 430.  The court in McMillon, without any elaboration, stated that the truck was being operated in both situations, implying that the tractor trailer was leased to another business.  The case provides no details regarding the agreement between Smalley and Washington except to say that it was a "trip lease agreement".  Thus because the court is unable to ascertain whether any of the factors were present that distinguishe a lease from a service contract, the case is unpersuasive.

Canal also argues that under the Federal Motor Carrier Safety Act, the agreement was a lease or contract, or at least an "arrangement" and that GP was an "authorized carrier"  because it dispatched the trucks and trailers in interstate commerce.  Canal asserts that 49 U.S.C. § 14102 regulates the arrangements by which a motor carrier uses non-owned tractors to transport its property.  Canal also asserts that the agreement "falls squarely" within the definition of a lease.  The regulation defining a lease, sets forth as follows:

> Lease. A contract or arrangement in which the owner grants the use of equipment, with or without driver, for a specified period to an authorized carrier for use in the regulated transportation of property, in exchange for compensation.

49 C.F.R. § 376.2(e).

U.S. Fire responds that other than the Federal Government Carrier Profile or Snapshot of Golden Peanut (Snapshot), Canal has offered nothing to prove that GP is a motor carrier (authorized carrier) such that these provisions would apply.  U.S. Fire also argues that when the

16

facts of this case were examined under other sections of the regulations, the facts do not support a finding that there was a lease or other arrangement as contemplated by the regulations. (Doc. 284).

In 29 C.F.R. § 376.11 the general leasing requirements are discussed further.  With some exception, the regulation requires (a) a written lease granting the use of equipment and "meeting the requirements contained in § 376.12",  " (b) . . receipts, specifically identifying the equipment to be leased and stating the date and time of day possession is transferred" in the form prescribed by the regulation; . . . and that the "(c) . . . authorized carrier acquiring the use of equipment under this section shall identify the equipment as being in its service..." [attach a sign to the vehicle] . . . ." Id.  Subsection (d) requires that the authorized carrier keep records of the equipment and sets forth the method for record keeping.  Id.

Review of these regulations in conjunction with the agreement between CTI and Tillery shows that although the agreement may arguably meet the definition of a lease under section 376.2(e), the agreement does not meet the actual requirements of a lease found in sections 376.11 and 376.12.  Canal argues that the agreement need not meet all the requirements in order for GP to be subject to the Federal regulations and that a "common carrier cannot escape liability by arbitrarily following some requirements and not others and then argue that, technically, there was no lease."  (Doc. 278 (citation omitted)).  Section 376.12 sets forth thirteen specific requirements for written leases.  The court will not address each one, however, the primary dispositive requirement is found in section 376.12(c)(1) which instructs that "the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease." Id.  This requirement has not been met.  The only evidence of record is that GP did

not have exclusive possession and control of the 1989 Peterbilt or any other tractor owned by CTI (or for that matter any possession or control) and that CTI could use its tractors to haul for other customers at any time so long as hauling services for GP was not impaired.

Canal also argues that the agreement can be construed as a lease because it covers a time period greater than one year and relies upon Georgia law which states that

> [a] long-term automobile leasing has been defined as one covering at least one year: 'Leasing is the term used in the (automobile) industry to describe the contract hiring of vehicles for a fixed period on a relatively long-term basis (for example, by the year or longer period).

Canal 395 F. Supp at 970.  However, as U.S. Fire responds the length or duration of the agreement between CTI and GP does not alter the fact that GP did not have an exclusive right to control and use a designated tractor belonging to CTI.  Additionally, the court in Canal also defined a lease as "a contract by which one owning such property grants to another the right to possess, use and enjoy" the property. Id.

Accordingly, the court finds that the agreement between CTI and Tillery was not a "lease, contract of hire, bailment, rental agreement, or any similar contract or agreement either written or oral, expressed or implied[]" as contemplated by the Endorsement.   Thus, because the Truckman's Endorsement does not apply, Canal's coverage for CTI and Tillery is primary.


B.  Primary coverage

Having determined that the Truckman's Endorsement does not apply, the next issue is whether Canal's policy and/or U.S. Fire's policy is primary and/or co-primary as to CTI, Tillery and GP.  The parties do not dispute that CTI and Tillery (assuming that the Truckman's Endorsement does not apply) are insured under Canal's policy or that GP is insured under the

U.S. Fire and St. Paul policies.  Also, the parties do not dispute that CTI and Tillery are covered under the U.S. Fire policy as permissive users of the trailer.

Georgia law provides that "[e]very insurance contract shall be construed according to the entirety of its terms and condition as set forth in the policy and as amplified, extended or modified by any rider, endorsement or application made a part of the policy" Ga. Code Ann. § 33-24-16.   To determine who is primary, Georgia law looks to the intent of the parties. Ga. Code Ann. § 13-2-3.   To ascertain intent, insurance contracts are governed by ordinary rules of construction for contracts. Ga. Code Ann. § 13-2-3. (Id).  Also, the courts should give words their usual and common significance. (Id).

> Under Georgia law, contracts of insurance are interpreted by ordinary rules of contract construction. [footnote omitted]  Three well known rules ... apply. Any ambiguities in the contract are strictly construed against the insurer as drafter of the document; any exclusion from coverage sought to be  invoked by the insurer is likewise strictly construed; and insurance contracts are to be read in accordance with the reasonable expectations of the insured where possible. [footnote omitted] Where the terms are clear and unambiguous and capable of only one reasonable interpretation, the court is to look to the contract alone to ascertain the parties' intent. [footnote omitted]  The contract is to be considered as a whole, and each provision is to be given  effect and interpreted so as to harmonize with the others. [footnotes omitted]

Georgia Farm Bureau Mut. Ins. Co. v. Gaster, 546 S.E.2d 30, 31 (Ga. App. 2001) (declaratory judgment action construing a homeowner's insurance policy).  Additionally, "'[a]n insurance company may fix the terms of its policies as it wishes, provided they are not contrary to law, and it may insure against certain risks and exclude others.'" S & T Timber, Inc. v. Southern General Ins. Co., 400 S.E.2d 379, 380 (Ga. App. 1990) (citations omitted).

U.S. Fire and Canal agree that Georgia law requires a comparison of the "other insurance" clauses of the policies at issue to determine which insurer is primary. Holyoke

Mutual Insurance Co. v. Cherokee Insurance Co., 386 S.E.2d 524 (Ga. App. 1989).

    1) Whether GP has coverage under the Canal Policy?

    Initially, U.S. Fire argued that GP was primarily insured under Canal's policy and therefore Canal owed a duty to defend and indemnify GP. (Doc. 63).  However, now U.S. Fire is not seeking to recover the $1 million it paid to settle the litigation on behalf of GP but is seeking to recover the costs for defending GP. (Docs. 266, 284, 292, p. 35).[7]  U.S. Fire acknowledges that its policy provides coverage to its insured GP and to CTI and Tillery as permissive users. However, U.S. Fire argues that because the "other insurance" clause in its policy makes the U.S. Fire policy excess, Canal's coverage is primary as to CTI, Tillery and GP. (Doc. 62, p. 34, 266, 284).

    In support of U.S. Fire's position that GP is insured under the Canal policy, U.S. Fire points to the "Persons Insured" provision, section (d) of Canal's policy.  Section (d) provides that persons insured includes "any other person or organization but only with respect to his or its liability because of acts or omissions of an insured...".  U.S. Fire admits that under this provision the Canal policy coverage for GP is limited to GP's vicarious liability for acts of CTI and Tillery.  However, U.S. Fire contends that the complaint provides the basis for Canal's duty to defend because although the complaint stated that the allegations were against the defendants "separate and severally" the allegations in the complaint imputed liability to GP because of acts not within GP's control.  U.S. Fire also argues that the negligent entrustment allegation is an allegation of vicarious liability. (Doc. 62, 63, 122)

---

[7]  In a motion for summary judgment, U.S. Fire contradicts this position and argues that under Georgia law, Canal and U.S. Fire cannot seek reimbursement for defense costs from each other. (Doc. 217, 218).

Canal responds that the "Persons Insured" section of its policy does not cover GP. Specifically, Canal argues that GP would only be covered for GP's vicarious liability of CTI's and Tillery's acts or omissions.  (Doc. 56, 104, 263)  Canal argues that because the underlying complaint pled for separate and several liability and not vicarious liability, provision III (d) which provides coverage for vicarious liability does not apply and therefore Canal's policy does not extend coverage to GP. (Doc. 104, p. 11-12).

Under Georgia law "an insurer's duty to defend is determined by comparing the allegations of the complaint with the provision of the policy".  Batson-Cook Co. v. Aetna Ins. Co., 409 S.E.2d 41, 42 (Ga. App. 1991).  The complaint in the underlying case has been amended four times. (Docs. 1, 17, 55, 65, 148).  Each complaint is slightly different but in sum plaintiff (the Arnolds) pled that the defendants (CTI, Tillery and GP) were "separately and severally" liable for negligence as to the ownership, maintenance, modification, repairs, and operation of the tractor trailer or truck/trailer.  Black's Law Dictionary defines "several liability" as "liability that is separate and distinct from another's liability".  "Vicarious liability" is defined as "liability that a supervisory party bears for the actionable conduct of a subordinate or associate because of the relationship between the two parties".  The complaint clearly alleges that GP is liable severally for its part in the negligent maintenance, repair, modification and operation of the truck/ trailer or tractor trailer.  To the extent that GP was not personally responsible for any of the alleged acts, GP would have had a factual defense to these allegations. There is simply no indication from the complaint that plaintiff was attempting to hold GP liable for CTI and Tillery's acts or omissions.        U.S. Fire argues that the court should look beyond the complaint to the "true facts" which are known or ascertainable to the insurer to determine

whether the insurer owes a defense.  In support of this proposition U.S. Fire cites <u>Penn-America</u> <u>v. Disabled American Veterans</u>, 490 S.E.2d 374 (Ga. 1997).  In <u>Penn-America</u> the court held that when a complaint alleges facts, even if false, that support coverage an insurer has a duty to defend.  The court further held that if there are facts that are ascertainable to the insurer from the outset that support coverage, then the insurer has a duty to defend. <u>Id</u>. at 376.  U.S. Fire has failed to allege what "true facts" were ascertainable to the insurer from the outset that would have supported coverage.

The plaintiffs in the underlying case (the Arnolds) chose to bring suit against each defendant separately and severally.  The Arnolds alleged that GP, CTI and Tillery each negligently committed certain acts.  U.S. Fire's argument regarding the "true facts" appears to be that CTI and Tillery were negligent and without their negligence GP could not be negligent.  This may have been true but it doesn't change the fact that the Arnold's complaint failed to allege that GP was responsible for CTI's and Tillery's acts or omissions.  Allegations of GP's negligence are separate and several from any negligence of CTI or Tillery.

U.S. Fires also points to the allegation in the complaint that the defendants were guilty of negligent and/or wanton entrustment of the truck/trailer to Tillery in support of its position that the complaint alleged vicarious liability.  The complaint cannot be reasonably construed to allege that GP is liable for CTI's negligent entrustment.  Rather the complaint alleges as to GP that GP negligently entrusted the truck/trailer to Tillery.  Again, to the extent this is factually incorrect it would have been a defense for GP.  Under Alabama law, which is the law applicable to the complaint, negligent entrustment "does not arise out of the relationship of the parties but rather is an independent tort resting upon the negligence of the entrustor in entrusting the vehicle to an

incompetent driver". <u>Bruck v. Jim Walter Corp.</u>, 470 So.2d 1141, 1143 (Ala. 1985). Thus, it is a claim that would rise or fall on the proof that GP entrusted the vehicle to an incompetent driver. There is no allegation that GP is liable for the negligent entrustment by CTI. U.S. Fire should not "confus[e] the liability of the driver of the car [Tillery] or his principle [CTI] for the negligent operation of the car, with the liability of the owner or custodian of the car for intrusting its operation to an incompetent driver. The two phases of liability are separate and distinct, and in the latter case the liability is not based upon the doctrine of respondeat superior." <u>Rush v. McDonnell</u>, 106 So. 175, 178 (Ala. 1925). It is true that to prove negligent entrustment the plaintiff must prove that the driver was incompetent. However, GP only had responsibility for this incompetence if it was proven that GP negligently entrusted a vehicle to Tillery. Thus GP's liability is based on its own acts. Accordingly, Canal's policy which provides coverage for vicarious liability is not applicable. GP does not have coverage under the Canal policy thus GP is not entitled to defense costs.

 2) <u>Whether the U.S. Fire and St. Paul policies provide primary coverage for CTI and Tillery?</u>

 Canal argues that under the U.S. Fire policy CTI and Tillery are insured as permissive users of the trailer and that the policies of U.S. Fire and St. Paul, as U.S. Fire's excess coverage carrier that drops down in U.S. Fire's place, provide primary coverage as to CTI and Tillery. Therefore, Canal argues, U.S. Fire should reimburse Canal the defense costs it has paid and St. Paul should reimburse Canal the $1 million paid to settle the underlying litigation. (Doc. 56, 104, 105, 248, 249). Canal's argument assumes that Canal is not primary due to the Truckman's Endorsement. In the alternative Canal argues that U.S. Fire and St. Paul are co-primary and thus

contribution is required.

As discussed above, because the Truckman's Endorsement does not apply, Canal is a primary provider for CTI as the named insured and Tillery as a permissive user.  The issue now is whether the U.S. Fire policy also provides primary coverage to CTI and Tillery such that contribution is required.

In identifying who is an insured, U.S. Fire's policy sets forth in pertinent part as follows:

> Throughout this policy the words "you" and "your" refer to the
> Named Insured shown in the Declarations [Golden Peanut].
>
> A. Coverage
> We will pay all sums an "insured" legally must pay as damages because of
> "bodily injury" or "property damage" to which this insurance applies, caused by
> an "accident" and resulting from the ownership, maintenance or use of a covered
> "auto."  . . .
>
> 1. The following are "insureds":
>> a. You for any covered "auto".
>> b. Anyone else while using with your permission a covered "auto"
>> you own, hire or borrow except:...
>> c. Anyone liable for the conduct of an "insured" described above but
>> only to the extent of that liability.

Thus, under the U.S. Fire policy, CTI and Tillery would be covered as permissive users.

In regard to other insurance available, the U.S. Fire policy sets forth as follows:

> Section IV - Business Auto Conditions
>> B.  General Conditions
>> 5. Other Insurance
>> a.      For any covered "auto" you own, this Coverage Form
>>         provides primary insurance.  For any covered "auto" you
>>         don't own, the insurance provided by this Coverage Form
>>         is excess over any other collectible insurance.  However,
>>         while a covered "auto" which is a trailer is connected to
>>         another vehicle, the Liability Coverage this Coverage Form
>>         provides for the "trailer" is:
>>
>>         (1)      Excess while it is connected to a

24

motor vehicle you do not own.

        (2)     Primary while it is connected
                    to a covered "auto" you own.

. . .

    d.     When this Coverage Form and any other Coverage Form or
           policy covers on the same basis, either excess or primary,
           we will pay only our share. Our share is the proportion that
           the Limit of Insurance of our Coverage Form bears to the
           total of the limits of all the Coverage Forms and policies
           covering on the same basis.

The terms of the policy unambiguously provide that "while a covered 'auto' which is a trailer is connected to another vehicle, The Liability Coverage this Coverage Form provides for the 'trailer' is (1) **Excess** while it is connected to a motor vehicle you [GP] do not own." Thus, since it is the trailer that is the basis for liability coverage under the U.S. Fire policy and the trailer was connected to a vehicle that GP did not own, U.S. Fire's policy is clearly excess to any other insurance for its insureds.[8]

Canal's policy contains an "Other Insurance" clause which states as follows:

    6. Other Insurance: The insurance afforded by this policy is
    primary insurance, except when stated to apply in excess of or
    contingent upon the absence of other insurance. When this
    insurance is primary and the insured has other insurance which is
    stated to be applicable to the loss on an excess or contingent basis,
    the amount of the company's liability under this policy shall not be
    reduced by the existence of such other insurance.

    When both this insurance and some other insurance apply to the
    loss on the same basis, whether primary, excess or contingent, the
    company shall not be liable under this policy for a greater
    proportion of the loss than that stated in the applicable contribution

_____

[8] U.S. Fire previously argued that 5(a) did not apply to CTI and Tillery. (Doc. 62). However at oral argument it reversed its position and argued that 5(a) clearly applied to CTI and Tillery. The court allows the new argument because it is clearly correct and in fairness, Canal's position on various issues has also evolved. (see e.g. Doc. 281)

provision below:

Thus, by the clear terms of the Canal policy its primary coverage for CTI and Tillery is only subject to its contribution provision when there is other insurance that applies to the loss on the same basis.  Because the U.S. Fire policy is excess and Canal's policy is primary the insurance is not on the same basis.  Therefore Canal cannot seek contribution.

As to the St. Paul policy, even assuming that Canal's argument that St. Paul "dropped down" to take U.S. Fire's place upon U.S. Fire tendering its policy limits is correct, the end result is that St. Paul was an excess provider.  Thus, there is no basis for Canal to seek contribution from St. Paul.

V.  Conclusion

Accordingly, the Canal's motions for summary judgment (Doc. 55, 248); U.S. Fire's motions for summary judgment (Doc. 63, 217, ); St. Paul's motions for summary judgment (Doc. 88, 245) which seek declarations regarding the coverage provided by each of their insurance policies are **GRANTED** as to the requests for declaration that: 1) The Truckman's Endorsement in Canal's policy is not applicable; 2) Canal's policy provides primary insurance for CTI and Tillery; 3) Canal's policy does not provide coverage for GP thus GP is not entitled to defense costs; 4) U.S. Fire provides excess coverage for CTI and Tillery and thus Canal is not entitled to contribution from U.S. Fire or from St. Paul.  All other request for declarations regarding the coverage provided by each policy is **MOOT,** or if not moot, **DENIED**.

**DONE** and **ORDERED** this the 26th day of May, 2006.

 **s / Kristi K. DuBose**
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**